PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LANSDOWNE ON THE POTOMAC
HOMEOWNERS ASSOCIATION, INC.,

        *Plaintiff-Appellee,*

    v.

OPENBAND AT LANSDOWNE, LLC;
OPENBAND SPE, LLC; OPENBAND
MULTIMEDIA, LLC; M.C. DEAN,
INC.,

        *Defendants-Appellants,*

        and             No. 12-1925

LCD COMMUNICATIONS, LLC;
OPENBAND OF VIRGINIA, LLC;
WILLIAM H. DEAN; LANSDOWNE
COMMUNITY DEVELOPMENT, LLC,

        *Defendants.*

---

FEDERAL COMMUNICATIONS
COMMISSION,

    *Amicus Supporting Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Anthony J. Trenga, District Judge.
(1:11-cv-00872-AJT-TCB)

Argued: January 29, 2013

Decided: April 5, 2013

Before WILKINSON, MOTZ, and THACKER,
Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Motz and Judge Thacker joined.

---

**COUNSEL**

**ARGUED:** Sanford M. Saunders, Jr., GREENBERG
TRAURIG, LLP, Washington, D.C., for Appellants. Christo-
pher J. Wright, WILTSHIRE & GRANNIS, LLP, Washing-
ton, D.C., for Appellee. **ON BRIEF:** Robert P. Charrow,
Laura Metcoff Klaus, GREENBERG TRAURIG, LLP, Wash-
ington, D.C., for Appellants. Steven A. Fredley, Mark D.
Davis, WILTSHIRE & GRANNIS, LLP, Washington, D.C.,
for Appellee. Sean A. Lev, General Counsel, Peter Karanjia,
Deputy General Counsel, Jacob M. Lewis, Associate General
Counsel, Matthew J. Dunne, Counsel, FEDERAL COMMU-
NICATIONS COMMISSION, Washington, D.C., for Amicus
Supporting Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Lansdowne on the Potomac Homeowners Association sued
OpenBand, a group of interlocking entities that provides cable
services to the Lansdowne on the Potomac real estate develop-
ment.[1] The homeowners association alleged that OpenBand

---

[1]We use the name "OpenBand" to refer collectively to all of the defen-
dants (now appellants) in this case: OpenBand at Lansdowne, OpenBand
Multimedia, OpenBand SPE, OpenBand of Virginia, and their common
corporate parent, M.C. Dean, Inc.

entered into a series of contracts that conferred upon Open-Band the exclusive right to provide video services to the development, in violation of an order of the Federal Communications Commission prohibiting such exclusivity arrangements. The district court agreed, declaring the challenged provisions null and void and permanently enjoining their enforcement. Because the contract provisions prohibit competing cable providers from accessing the Lansdowne development in patent violation of the FCC's Order, we affirm the judgment of the district court.

## I.

## A.

In 1992, Congress enacted the Cable Television Consumer Protection and Competition Act ("1992 Cable Act"), Pub. L. No. 102-385, 106 Stat. 1460. Congress made several findings in passing the Act, among them that "most cable television subscribers have no opportunity to select between competing cable systems"; that this lack of competition had led to "undue market power for the cable operator as compared to that of consumers"; and that cable prices were rising almost three times faster than the rate of inflation. 1992 Cable Act § 2(a)(2), (1), 106 Stat. at 1460. The Act accordingly made it unlawful for a cable operator to engage in "unfair methods of competition or unfair or deceptive acts or practices, the purpose or effect of which is to hinder significantly or to prevent" any other operator from providing services to consumers. 47 U.S.C. § 548(b). The Act also authorized the FCC to "prescribe regulations to specify particular conduct that is prohibited by" this provision. *Id.* § 548(c)(1).

Pursuant to that authority, the FCC issued a notice of proposed rulemaking in March 2007 soliciting comments on the propriety of a practice popular among cable operators: the use of "exclusivity clauses" that grant the operator exclusive access for providing video services within a particular multi-

ple dwelling unit ("MDU"). *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*, 22 FCC Rcd. 5,935 (proposed Mar. 27, 2007). In response, the FCC received comments revealing that exclusivity clauses "have the clear effect of barring new entry into MDUs by wire-based" video providers and that such clauses were "widespread" and increasing in their use. *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*, 22 FCC Rcd. 20,235 ¶¶ 10, 15 (Nov. 27, 2007) ("*Exclusivity Order*"). Commenters also highlighted the injuries that exclusivity clauses inflict upon consumers, such as increased prices, lower quality, and a reduced menu of cable channel options. *See id.* ¶ 17-23. The FCC thus concluded that "exclusivity clauses cause significant harm to competition and consumers" and that "the harms of [such] clauses outweigh their benefits." *Id.* ¶ 26.

Based on this record, the FCC unanimously adopted the *Exclusivity Order* at issue in this case. The order sets forth the following rule: "[N]o cable operator . . . shall enforce or execute any provision in a contract that grants it the exclusive right to provide any video programming service (alone or in combination with other services) to a MDU. Any such exclusivity clause shall be null and void." *Exclusivity Order* ¶ 31 (codified at 47 C.F.R. § 76.2000(a)).

### B.

In 1999, a partnership of Virginia land developers created the Lansdowne Community Development ("LCD"), a limited liability company with the purpose of developing a residential community known as Lansdowne on the Potomac in Loudoun County, Virginia. The Lansdowne development comprises roughly 850 acres of land, upon which some 2,155 individual homes are built. Although Lansdowne residents own their own homes, all residents share an interest in common areas that require central management. LCD therefore created

appellee, the Lansdowne on the Potomac Homeowners Association ("LHOA" or "the homeowners association"), to provide for the management of the development and amenities such as video, phone, and internet services.

In the process of planning the development, LCD engaged M.C. Dean, Inc., a Virginia technical services contractor, to design and install telecommunications systems in the community. For its part, according to M.C. Dean's CEO, the company sought from LCD the "exclusive right to provide . . . telecommunication services" to Lansdowne. M.C. Dean created a number of corporate entities and entered into a series of contemporaneous, interlocking contractual arrangements to achieve this end.

The structure of this whole enterprise was a convoluted one. With respect to the corporate entities, M.C. Dean formed OpenBand at Lansdowne ("OBL"), a limited liability company with the purpose of developing and administering telecommunication services at Lansdowne. OBL had two members: a wholly owned subsidiary of M.C. Dean's called OpenBand SPE ("OBS"), which M.C. Dean created for the purpose of holding its interest in OBL, and a subsidiary of LCD's called LCD Communications.[2] M.C. Dean also formed OpenBand Multimedia, LLC ("OBM"), which is an FCC-certified open video system operator that provides video and internet services to Lansdowne and other Virginia communities. Lastly, M.C. Dean formed OpenBand of Virginia ("OBV"), which provides phone service to Virginia communities, including Lansdowne. OBL, OBS, OBM, OBV, and M.C. Dean are all defendants and appellants in this case (collectively, "OpenBand").[3]

---

[2]Prior to this suit, LCD Communications transferred its interest in OBL to OBS, leaving it the sole member of OBL.

[3]The developer, LCD, and its subsidiary LCD Communications were initially named as defendants but were dismissed voluntarily under Federal Rule of Civil Procedure 41(a)(1)(A)(i).

With respect to the contractual arrangements, three are of particular relevance. First, LCD granted a deed of easement to OBL on May 14, 2001, entitled the "Exclusive Easement for Telecommunications Services at Lansdowne on the Potomac." LHOA is named as a party to the deed as the "Future Owner" of the Property. LHOA ratified the easement acting through its then-president (who was also president of LCD, which controlled LHOA at the time).[4] By its express terms, the deed grants to OBL "exclusive easements for the purpose of constructing, operating, maintaining, adding to, altering, or replacing (collectively 'Administering' or 'Administer') [telecommunications infrastructure] for the collection, provision, and distribution of video, telephonic, internet, data services, or other communications, data or media (collectively 'Utilities')." The deed provides that "the exclusive easements" shall be "deemed to reserve solely to [OBL] the rights to Administer Utilities on, under and across the Property such that . . . no other person or entity shall be entitled to Administer any Utilities on, under or across the Property without the written consent of [OBL]." The deed also prohibits LHOA from "grant[ing] any easement to Administer any Utilities on, under or across the Property" to any other party.

The second arrangement at issue is the Covenants, Conditions, and Restrictions for Lansdowne on the Potomac (the "CC&Rs"), dated June 18, 2001. The CC&Rs include a provision expressly recognizing OBL's "exclusive easements for access to and the installation, construction, [and] operation . . . of a private utility and telecommunication system." The CC&Rs refer to OBL's exclusivity in several other places, including a provision declaring that OBL's "rights with respect to the private utility system . . . and the services provided through such private utility system are exclusive, and no other Person may provide such services to the Property."

---

[4]The easement was actually granted to OBL through a two-step process involving an initial grant of the easement by the developer LCD to its subsidiary LCD Communications, followed by a second grant from LCD Communications to OBL.

Finally, OBL entered into a contract with the homeowners association on July 24, 2001, entitled the "Agreement to Obtain Telecommunication Services" ("TSA"). Under the TSA, LHOA engaged OBL to provide "platform services," or basic video, phone, and internet services that homeowners receive, as well as optional "premium services." The TSA grants OBL the right to "provide[ ] or arrange for the provision of the Platform Services to Homeowners so that [LHOA] shall not engage any other provider of Platform services." The TSA also incorporates the CC&Rs (which incorporate the easement as described above) by prohibiting LHOA from "amend[ing] the CC&Rs such that the amendment would . . . have a materially adverse effect on OBL."

## C.

In terms of its actual delivery of telecommunications services, OBL purchases services from its affiliates—video and internet from OBM and telephone from OBV—and resells them to Lansdowne homeowners. OBL also separately sells its services to LHOA itself for purposes of the Potomac Club, a community center and office space that the homeowners association maintains on the property. In accordance with the terms of the easement, CC&Rs, and TSA described above, no wire-based cable provider other than OBL has the infrastructure necessary to deliver services to the development. As one M.C. Dean executive explained, "the entire agreement was set up so that we could have our infrastructure in that fashion," that is, through a blanket easement over the Lansdowne community.

After OBL began providing cable to Lansdowne, residents began complaining about the quality of its service. One homeowner, Marvis Aleem, noted that OBL's "picture quality was frequently pixilated and the channel line-up, both in terms of quantity and high-definition offerings—was inferior to those of other video providers." Another homeowner, Tim McCoy, complained of OBL's "poor picture quality, channel line-up,

equipment technology, and customer service." McCoy described a number of specific problems with OBL's video service. For example, during the second half of the 2012 Super Bowl, portions of his screen pixilated, or froze, despite the fact that McCoy had complained to OBL about pixilation problems previously. McCoy also experienced synchronization problems, where a particular channel would display the correct video feed accompanied by a different channel's audio feed.

In response to these complaints, the homeowners association began investigating alternative providers in 2010. One member of LHOA's board of directors had discussions with Verizon, which demonstrated an interest in providing services to the development. However, a Verizon employee subsequently emailed the LHOA board member expressing concern that OBL's "exclusive easements" would prevent it from "build[ing] out on or otherwise access[ing] the property." Another competing video service provider, Comcast, is contractually required to make cable services available to Lansdowne residents under the terms of its franchise agreement with Loudoun County. The franchise agreement excuses this requirement, however, in developments like Lansdowne that "are subject to claimed exclusive arrangements with other providers." It is undisputed that neither Verizon nor Comcast has formally asked OBL to grant it a subeasement to build its own infrastructure. However, as one M.C. Dean official testified, "would we object to [Verizon] coming into the community and running their infrastructure? I would say that we would."

D.

In August 2011, LHOA filed suit against OpenBand in the Eastern District of Virginia, alleging a variety of claims under federal and state law. OpenBand moved to dismiss, and the district court agreed as to all of the federal counts but one: the homeowners association's claim that certain clauses in Open-

Band's contractual arrangements provide it with the exclusive right to deliver video services in violation of the FCC's 2007 *Exclusivity Order*.[5] Following discovery, the parties filed cross-motions for summary judgment on this claim. On June 27, 2012, the district court ruled in favor of the homeowners association. The court thus issued an order permanently enjoining OBL, OBM, OBS, and M.C. Dean from enforcing any video service exclusivity provision against LHOA or Lansdowne residents, and declaring all such provisions null and void.

OpenBand then filed the instant appeal. We review the grant of summary judgment de novo, asking whether, viewing the facts in the light most favorable to OpenBand, there is no genuine dispute as to any material fact and LHOA is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## II.

Before reaching the merits of LHOA's claim, we must first address some threshold questions of justiciability. For "[i]f a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). OpenBand claims both that LHOA lacks standing to bring this action and that the suit is not ripe for our review. *See id.* at 352 (noting that standing and ripeness both "originate in Article III's 'case' or 'controversy' language").

## A.

The "irreducible constitutional minimum of standing" consists of three requirements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must show that it has suffered an "injury in fact" that is concrete and immi-

---

[5]The district court declined to exercise supplemental jurisdiction over the state law claims, dismissing them without prejudice.

nent; second, the injury must be "fairly traceable" to the defendant's challenged conduct; and third, it must be likely that the injury will be "redressed by a favorable decision." *Id.* at 560-61 (internal quotation marks and alterations omitted). OpenBand asserts that LHOA cannot satisfy any of these requirements, but for the reasons that follow, we disagree.

1.

With respect to the element of injury, LHOA is a direct consumer of OBL's video services, which LHOA purchases for the Potomac Club. Although OpenBand does not dispute that a cognizable injury would exist if it were actually to prohibit LHOA from contracting with a competing provider, OpenBand contends that LHOA has suffered no injury here because "[n]othing in the TSA or other agreements precludes LHOA from" doing so. Appellants' Br. 19.

This contention is impossible to square with the plain terms of the challenged agreements. To start, OBL's deed of easement unambiguously bars LHOA from engaging another provider of video services. In fact, the deed blockades other providers from accessing the property to build the infrastructure necessary for delivering service in the first place. To that end, OBL owns "exclusive easements for the purpose of constructing [or] operating" infrastructure for the "provision, and distribution of video [services]." The deed states that these "exclusive easements" shall be "deemed to reserve solely to [OBL] the right[ ] to" construct infrastructure for such services and that "no other person or entity shall be entitled to" do so without OBL's consent. And the deed expressly prohibits LHOA from "grant[ing] any easement" to any other party for the purpose of building such infrastructure.

The CC&Rs likewise prevent LHOA from contracting with a competing video provider. For example, the CC&Rs state that OBL's "rights with respect to the private utility system . . . and the services provided through such [system] are

exclusive, and no other Person may provide such services to the Property." Moreover, the exclusivity clauses in the CC&Rs are incorporated into the TSA, which prohibits LHOA from "amend[ing] the CC&Rs such that the amendment would . . . have a materially adverse effect on OBL."

OpenBand has also admitted that the whole purpose of its agreements was to preclude LHOA from contracting with competing cable providers—the very result that OpenBand now seeks to disclaim. For example, OpenBand conceded in the district court that OBL's easement "effectively bar[s] other providers of wired services from Lansdowne." Defs.' Br. in Supp. of Mot. to Dismiss 22. M.C. Dean's Executive Vice President testified that "nobody else has infrastructure within the community to deliver wireline service." When asked why that was so, the executive candidly answered, "[b]ecause the entire agreement was set up so that we could have our infrastructure in that fashion."

Recognizing the futility of its contention that its various arrangements do not bar the homeowners association from engaging competing providers, OpenBand changes tack and raises a second argument as well: that "the mere existence of an exclusivity clause" gives rise to no injury at all unless the clause is actually enforced. Appellants' Reply Br. 5-6. That would be surprising news to the FCC, which enacted the Exclusivity Order based on its express finding that "exclusivity clauses cause significant harm," in particular that they deny consumers the benefits of "lower prices," "more channels," and improved "quality of service." *Exclusivity Order* ¶ 26, 17 & n.50. Significantly, the FCC found that these injuries occur not only where exclusivity clauses are actually enforced, but rather by virtue of their very existence because such clauses "*deter new entrants*" from even "attempting to enter the market." *Id.* ¶ 19 (emphasis added). As the FCC explained, "[a] rule that left exclusivity clauses in effect would allow the vast majority of the harms caused by such clauses to continue for years." *Id.* ¶ 35. It is for this reason

that the order declares "any" exclusivity clause "null and void" without regard for whether it has been enforced. *Id.* ¶ 31.

Because OpenBand's exclusivity clauses preclude LHOA from engaging an alternate provider of video services for its club house, producing the precise injuries that the FCC identified in enacting its *Exclusivity Order*, we hold that LHOA has suffered a cognizable injury for purposes of Article III standing.

2.

The second element of standing requires a plaintiff to demonstrate that its injuries are fairly traceable to the challenged conduct of the defendants. *Lujan*, 504 U.S. at 560. OpenBand argues that any injury suffered by LHOA is not caused by it, but rather by the independent, intervening actions of third parties not before the court—to wit, the decisions by competing companies not to offer video service to Lansdowne.

This argument ignores the reason why competing cable providers have not offered services to LHOA: the existence of OpenBand's exclusivity clauses. OpenBand's mistake, in other words, is to "equate[ ] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). But as the Supreme Court has explained, the causation element of standing is satisfied not just where the defendant's conduct is the last link in the causal chain leading to an injury, but also where the plaintiff suffers an injury that is "produced by [the] determinative or coercive effect" of the defendant's conduct "upon the action of someone else." *Id.* at 169.

That is what has occurred here. The record is replete with evidence that OBL's exclusivity arrangement caused competing cable providers not to offer LHOA their services. For

starters, an LHOA board member testified that during her discussions with Verizon, the company indicated that it "wanted to come down into Lansdowne and lay cable and service the Lansdowne residents." To that end, Verizon sent the homeowners association a letter identifying the services it could offer along with pricing options. Yet after Verizon analyzed OBL's exclusive easement, the CC&Rs, and the TSA, the company concluded that it could not provide service to Lansdowne because "nothing [Verizon has] seen would give us a green light to build out on or otherwise access the property."

Similarly, LHOA produced the franchise agreement between Loudoun County and Comcast. Under that agreement, Comcast is required to make service available to "all residential dwelling units" in the county, with the exception that it "shall not be required to serve potential Subscribers in developments" like Lansdowne that "are subject to claimed exclusive arrangements with other providers." Thus, as with Verizon, Comcast's decision not to offer video to Lansdowne is fairly traceable to OpenBand's challenged exclusivity arrangements. And although it took place before the FCC issued the Exclusivity Order, we also note that when Adelphia sought to provide service to Lansdowne in 2001, OBL denied its request, citing its exclusive easement. *See UCA, LLC v. Lansdowne Cmty. Dev., LLC*, 215 F. Supp. 2d 742, 747 (E.D. Va. 2002). We therefore hold that LHOA has established the second element of the Article III standing inquiry.

3.

Turning to the third standing requirement of redressability, our task is to determine if it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)). OpenBand contends that it is "entirely speculative" whether an order nullifying OBL's exclusivity clauses will redress LHOA's injuries because the courts cannot "order any alternative provider

to provide service or even negotiate with LHOA." Appellants' Br. 21, 20.

We do not agree. The record reveals that an order declaring OBL's exclusivity clauses null and void and enjoining OBL from enforcing them would indeed be likely to redress the lack of competition and accompanying quality, price, and menu of channel harms that LHOA currently suffers. As discussed above, Comcast's franchise agreement with Loudoun County *requires* it to "make Cable Service available to all residential dwelling units" in the county. Comcast has not fulfilled this obligation because its franchise agreement excuses the requirement in cases where a development is "subject to claimed exclusive arrangements with other providers." Thus, once OBL's exclusivity arrangement is eliminated, so too will be Comcast's reason for declining to provide service to Lansdowne. A favorable court ruling here is therefore not only "likely" to redress LHOA's injuries, but will necessarily do so. Having successfully established injury-in-fact, causation, and redressability, LHOA has standing in this case.[6]

## B.

We turn next to a second Article III threshold question: whether this dispute is ripe for adjudication. "The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form." *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006) (internal quo-

---

[6]LHOA also has associational standing to sue on behalf of its members because it introduced at the summary judgment stage two affidavits from individual members demonstrating they suffered injuries in their own right. That fact differentiates this case from our decision in *Southern Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, No. 12-1331, at *11-13 (4th Cir. Apr. 5, 2013), where we found associational standing lacking at the motion to dismiss stage because the complaint did not allege any such individual injuries, much less include affidavits to that effect. LHOA thus enjoys standing both directly and on behalf of its members.

tation marks omitted). To determine if a case is ripe, we "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Id.* at 319 (internal quotation marks omitted).

With respect to the fitness criterion, it is settled that a case is "fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.* OpenBand protests that this case is not fit for resolution because "there is no proof that OBL denied access to its easement or refused to grant a subeasement to anyone." Appellants' Br. 16. OpenBand asks this court to wait to decide this case because OpenBand might yet decide in the future to relinquish its claim to the exclusive right to provide video services at Lansdowne.

This argument fails for two reasons. To begin, OpenBand's position is unsupported by the record. The homeowners association has produced evidence that OpenBand has no intention of voluntarily abandoning its exclusivity. As already mentioned, an M.C. Dean executive stated on the record twice that OBL would, if asked, deny Verizon access to its easement. Another executive testified that the entire purpose of OBL's contractual arrangements was so that "nobody else [would have] infrastructure within the community to deliver wireline service." Eliminating the exclusive easement, the executive stated, would place "our entire business model . . . at risk."

In the face of these undisputed statements, we find OpenBand's claim of factual uncertainty completely untenable. OpenBand's argument amounts to little more than a formalistic contrivance. The case is not ripe, it complains, because it may at some point in the future gratuitously renounce its claim of exclusive access to the development. Yet OpenBand has fought this entire litigation to preserve that very exclusivity, stating repeatedly on the record that it has no intention of giving it up.

Moreover, even if there were some reason to think that OBL might abandon its exclusivity and allow competitors to access Lansdowne, that future prospect "would not assist our resolution of the" actual issue before this court. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 301 (1979). As noted earlier, the question here is whether OBL's exclusivity clauses, as written, violate the *Exclusivity Order*. Whether OBL enforces those clauses in the future is of no consequence because the order declares "any provision in a contract that grants [a cable operator] the exclusive right to provide any" video service "null and void." *Exclusivity Order* ¶ 31. Thus, whether OBL's clauses unlawfully grant it the exclusive right to provide video service is a legal question that is, in a sense, frozen in time: the answer does not change no matter how actively or passively OBL chooses to exercise that right.

Turning to the hardship prong of the ripeness inquiry, we find this to be a straightforward case. "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiff]." *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208-09 (4th Cir. 1992). Here, the hardship could not be any more immediate: because of OBL's exclusivity, LHOA and its residents are *presently* unable to avail themselves of the quality, price, and menu of channel advantages of a competing provider. *See Miller*, 462 F.3d at 321 (finding hardship prong satisfied where challenged action of the defendants had already caused "immediate harm" to plaintiffs).

So too is the burden imposed substantial. Each day that passes without judicial resolution is another day that LHOA and its homeowners go without the opportunity to obtain service from a competitor, despite the fact that the *Exclusivity Order* declares that any exclusivity clause "shall be null and void." While cable service may not be a matter of life and death, it is an important aspect of life for many Americans. Consider the plight of Lansdowne homeowner Tim McCoy, who, unable to contract with a competing provider and having

already paid OBL for his service, watched the second half of the 2012 Super Bowl in a state of apprehension that the video feed would freeze at any moment, as had happened before. Such homeowner concerns, especially in the absence of any need to await further factual developments, render this case ripe for our review.

## III.

Satisfied that Article III poses no obstacle to suit, we next consider OpenBand's argument that LHOA's claim falls outside the scope of the private right of action conferred by 47 U.S.C. § 401(b). That provision states: "[i]f any person fails or neglects to obey *any order of the Commission* . . . any party injured thereby . . . may apply to the appropriate district court of the United States for the enforcement of such order." 47 U.S.C. § 401(b) (emphasis added).

The district court held that LHOA may sue under this provision, reasoning that the *Exclusivity Order* qualifies as an "order of the Commission" because it "specifically defines the rights and obligations that a litigant can enforce." OpenBand argues that this was error for two reasons. First, it contends that § 401(b) permits enforcement of only adjudicatory orders, not rulemaking orders. In the alternative, OpenBand asserts that even if § 401(b) permits enforcement of some rulemaking orders—*viz.*, those that define the rights and obligations of litigants—the *Exclusivity Order* is not such an order. Again, however, we find OpenBand's arguments unpersuasive.

## A.

We begin with the question of whether § 401(b) ever permits parties to sue for enforcement of FCC rulemaking, as opposed to adjudicatory orders. OpenBand suggests that the answer is "no" because while the plain terms of § 401(b) authorize enforcement of "any order of the Commission," the

Administrative Procedure Act defines the term "order" to mean "the whole or a part of a final disposition . . . of any agency in a matter *other than rule making*," 5 U.S.C. § 551(6) (emphasis added).

We are not persuaded. To begin, the APA's definition of an "order" does not control in this context because § 401(b) pre-dates the APA by nearly twelve years, and the APA's definitions are only mandatory in the context of the APA itself. *See* 5 U.S.C. § 551 (definitions apply "[f]or the purpose of this subchapter"). Moreover, as the Ninth Circuit explained in *Hawaiian Telephone*, 827 F.2d at 1271, when Congress wanted to incorporate APA definitions into the Communications Act, it did so expressly—for example, explicitly defining the term "adjudication" by reference to the APA three times in 47 U.S.C. § 409(a)-(c). That Congress did not do so with regard to the term "order" in § 401(b) shows that it did not intend for the APA's limited definition of that term to apply here.

Interpreting the phrase "any order of the Commission" in § 401(b) to encompass rulemaking orders also respects the venerable principle of statutory construction that "identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). In *CBS, Inc. v. United States*, the Supreme Court construed the exact phrase at issue here, "any order of the Commission," to include some FCC rulemaking orders in the context of 47 U.S.C. § 402(a), which provides a right of action for setting aside an FCC order. 316 U.S. 407, 416-19 (1942). OpenBand has offered no persuasive explanation for why this interpretation of "any order of the Commission" should not also apply in the context of § 401(b), the immediately prior provision. We thus hold that § 401(b)'s right of action to enforce "any order of the Commission" can encompass both FCC adjudicatory and rulemaking orders. In so holding, we align ourselves with a majority of circuits to consider the question. *See, e.g.*, *Alltel Tenn., Inc. v. Tenn.*

*Pub. Serv. Comm'n*, 913 F.2d 305, 308 (6th Cir. 1990); *Hawaiian Tel. Co. v. Pub. Utils. Comm'n*, 827 F.2d 1264, 1270-72 (9th Cir. 1987). *But see New England Tel. & Tel. Co. v. Public Utils. Comm'n*, 742 F.2d 1, 4-7 (1st Cir. 1984).

### B.

Our holding that § 401(b) can extend to rulemaking orders does not, however, end the analysis. As we explained in *CGM, LLC v. Bellsouth Telecommunications, Inc.*, not all rulemaking orders are created equal for purposes of § 401(b)'s private right of action; only those that "require[ ] a defendant to take concrete actions" may be enforced. 664 F.3d 46, 53 (4th Cir. 2011) (internal quotation marks omitted). The reason for this rule is self-evident: if a rulemaking order merely announces agency findings or broad policy considerations without actually imposing specific obligations on identifiable entities, a § 401(b) action to enforce that order would present a court with nothing but generic abstractions to enforce.

Thus, for example, in *CGM*, we rejected a plaintiff's attempt to enforce under § 401(b) a rulemaking order that laid out "policy considerations [and] public feedback." *Id.* at 54. In fact, the order at issue in *CGM* made clear that parties were free to voluntarily contract around the relevant FCC rules and that state regulatory commissions (not the FCC) had the final authority to create binding obligations on the parties. *Id.* In light of these facts, we had no choice but to conclude that the plaintiff in *CGM* had "no rights" and the defendant "no duties" under the FCC order involved in that case. *Id.* at 55.

OpenBand contends that the same result should obtain here because the *Exclusivity Order* "impose[s] no obligation on any named party, confer[s] no rights to any named party, and, in fact, name[s] no parties or entities at all." Appellants' Br. 25. This argument misses the mark. For one, OpenBand badly misconstrues the controlling legal principle by focusing on

whether the order expressly names the precise parties involved in this litigation. No court has taken such a crabbed view of the rulemaking orders subject to § 401(b). And for good reason. The crucial distinction between adjudication and rulemaking is that "adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994). To require a rulemaking order to expressly (and presciently) name the parties in advance would fatally undercut the FCC's power to regulate via general and prospective rules, 47 U.S.C. § 154(i).

Consequently, as we explained in *CGM*, the ultimate test is simply whether the FCC order in question sets forth "specific rights and obligations of the[ ] litigants." 664 F.3d at 54. The *Exclusivity Order* satisfies this test. The order identifies the precise actions that OpenBand is prohibited from taking: no "operator of an open video system" may "enforce or execute any provision in a contract" granting it the "exclusive right to provide any video programming service." *Exclusivity Order* ¶ 51, 31. It defines OpenBand's rights in such exclusivity clauses accordingly: "[a]ny such exclusivity clause shall be null and void." *Id.* ¶ 31. The order likewise identifies the rights of LHOA and homeowners as part of a "centrally managed residential real estate development[ ]" that shall not be the subject of any exclusivity clause. *Id.* ¶ 7, 31. We therefore hold that the *Exclusivity Order* is sufficiently specific in defining the "rights and obligations of these litigants" to be enforceable under § 401(b). *CGM*, 664 F.3d at 54.[7]

---

[7]We also find OpenBand's statute of limitations argument to be without merit, as "[s]tatutes of limitations are not controlling measures of equitable relief." *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946). In this case, equitable relief is all that the homeowners association has sought.

IV.

We arrive at last at the question of whether the challenged clauses in the easement, CC&Rs, and TSA actually run afoul of the FCC's order. Resolving this question involves two-steps. First, we must decide whether OBL is an "open video system operator" such that its agreements are subject to the order to begin with. *Exclusivity Order* ¶ 51. If it is, we must then ask whether the challenged clauses are "provision[s] in a contract" granting OBL an "exclusive right to provide" video service in violation of the order. *Id.* ¶ 31.

OpenBand asserts that the answer to both of these questions is "no," but its arguments as to why ring hollow. OBL seeks first to evade the FCC's definition of an "open video system operator" by structuring its business operations among several related, interlocking entities in a kind of elaborate corporate shell game. OBL likewise seeks to avoid the *Exclusivity Order*'s flat prohibition on exclusivity clauses in any contract by splitting up its exclusive arrangement into an assortment of interconnected sub-agreements and placing its critical exclusivity provisions in a deed of easement that it contends is not a "contract" reached by the FCC's proscription. For the reasons that follow, we reject both of these efforts to circumvent the plain terms of the *Exclusivity Order*.

A.

We start with the question of whether OBL is an operator of an "open video system," or "OVS," within the meaning of the FCC's order. The answer matters because the order renders null and void exclusivity clauses that are entered into by "entities that are subject to [47 U.S.C. § 548]," among which OVS operators are included. *Exclusivity Order* ¶ 30, 51; 47 U.S.C. § 573(c)(1)(A) (stating that OVS operators are subject to § 548). Our inquiry is limited to whether *OBL* satisfies the definition of an OVS operator because OBL is the only defendant-appellant that is party to the agreements at issue.

To decide whether OBL is an OVS operator, we begin with the applicable regulatory definition. The FCC has defined an "[o]pen video system operator" to include:

> Any person [defined by 47 U.S.C. § 522(15) to include corporations] or group of persons who provides cable service over an open video system and directly or through one or more affiliates owns a significant interest in such open video system, or otherwise controls or is responsible for the management and operation of such an open video system.

47 C.F.R. § 76.1500(b). Openband does not dispute that OBL satisfies most of this definition. Its sole contention is that OBL cannot be said to "provide[ ] cable service" either as a "person" in its own right or as part of a "group of persons." 47 C.F.R. § 76.1500(b). The district court ruled against OBL in both respects, and we agree for the reasons below.

1.

OpenBand argues first that OBL is not itself a "person" who "provides cable service" because the cable service in question is actually that of its affiliate, OpenBand Multimedia, or "OBM", who OpenBand concedes is an FCC-certified OVS operator. OpenBand therefore contends that it is only OBM who "provides" cable service to LHOA and the homeowners; OBL merely "arranged for the provision of" that service by purchasing it from OBM and reselling it to Lansdowne. Appellants' Br. 8.

We cannot accept OpenBand's argument. To start, because neither Congress nor the FCC have defined the term "provide," we give the term its ordinary meaning. *See Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011). The ordinary meaning of "provide" is "to make available" or to "furnish." *Random House Dictionary of the English Language* 1556 (2d ed. 1987). OBL satisfies this defi-

nition because it is undisputed that OBM sells video service to OBL, which then uses its own connection lines, cables, and other infrastructure to transmit that video into Lansdowne, thereby "making available" or "furnishing" it to homeowners.

OpenBand's argument to the contrary is premised on the misguided view that the entity that is the *initial* link in a chain of delivery is the only one that can be said to "provide" the thing delivered. But that is not what "provide" means: if Angela tells Bob how to drive to the park, and Bob relays those instructions to Carmen, all would agree that Bob, no less than Angela (and perhaps more) has "provided" instructions to Carmen. Furthermore, OpenBand's argument refutes itself, since OBM (who OpenBand admits provides cable service) is not actually the initial link in the delivery chain— OBM instead contracts with video content providers who deliver programming that OBM in turn transmits to OBL. We therefore hold that OBL qualifies as an OVS operator under 47 C.F.R. § 76.1500(b) because it is itself an entity that "provides" cable service.

2.

Alternatively, even if OBL is not itself a person that "provides" cable service, it is undoubtedly part of a "group of persons" that does. 47 C.F.R. § 76.1500(b). In defining an OVS operator to include not just individual entities, but also groups of entities that provide cable service, the FCC's definition appears to envision precisely this type of scenario, where a corporate parent like M.C. Dean divides up the functions of an OVS operator across its subsidiaries such as OBM and OBL. Thus, as already described, OBM is able to deliver video to OBL's end customers in Lansdowne only by using OBL's physical infrastructure. OBM also has no direct contact with those customers; it is instead OBL who has contracted with customers to resell OBM's services. OBL and OBM thus operate together, functionally and contractually, in an integrated manner as a "group of persons who provides

cable service over an open video system," 47 C.F.R. § 76.1500(b).

OpenBand responds that treating OBL and OBM together as an OVS operator under the "group of persons" prong of the FCC's definition proves too much because under such an approach, "LHOA and its members also are OVS operators." Appellants' Reply Br. 19. OpenBand is mistaken. For one thing, LHOA and its homeowners are not a part of the same "group of persons" as OBM and OBL because unlike OBM and OBL, LHOA and the homeowners are not affiliated subsidiaries of M.C. Dean. For another, there is no evidence that LHOA or its homeowners satisfy the definitional requirement of "own[ing] a significant interest" in the OVS. 47 C.F.R. § 76.1500(b). Nor is there any evidence that LHOA or the homeowners somehow "control[ ]" or are "responsible for the management and operation" of the OVS. *Id.* Put simply, there is no reason to read the FCC's "group of persons" definition of an OVS operator so broadly as to sweep up individual homeowners; the definition is instead designed to fit exactly the kind of division of labor that exists here between corporate affiliates like OBL and OBM.

3.

OpenBand tosses up one final contention as to why OBL should not be bound by the *Exclusivity Order*: that the regulatory definition of an OVS operator in 47 C.F.R. § 76.1500(b) does not matter anyway. This is so, OpenBand suggests, because 47 U.S.C. § 573(a)(1) directs OVS operators to obtain certification from the FCC. Thus, in OpenBand's view, "only an entity that has received [such] certification can be an open video system operator." Appellants' Br. 34 n.14.

Yet again, OpenBand is mistaken. Its error this time is to ignore the obvious difference between a *definition* and a *duty*. The statutory obligation that an entity should certify with the FCC as an OVS operator is plainly the latter: 47 U.S.C.

§ 573(a)(1) does not purport to define what an OVS operator *is*, but rather identifies something that an OVS operator *should do*. Thus, § 573(a)(1) states that "[a]n operator of an open video system shall qualify for reduced regulatory burdens . . . if the operator of such system certifies to the Commission that [it] complies with the Commission's regulations."

Moreover, to read § 573(a)(1)'s certification requirement as somehow delimiting the kinds of entities that constitute an OVS operator would lead to absurd results. It would permit, for example, an entity to avoid all regulations applicable to OVS operators simply by refusing to certify with the FCC. In addition to defying logic, such a result cannot be squared with the text of the very statute that OpenBand relies on, which entitles an "operator of an open video system" to "qualify for *reduced* regulatory burdens" if it certifies with the FCC, not more. 47 U.S.C. § 573(a)(1) (emphasis added).

In sum, we reject OpenBand's attempt to circumvent the FCC's definition of an OVS operator. OpenBand's arguments hinge, at bottom, on the belief that it can evade unambiguous federal regulations by playing a shell game in which it divides up corporate functions so that one entity obtains certification from the FCC as an OVS operator, while a separate entity enters into otherwise-unlawful exclusivity agreements. We reject the notion that the *Exclusivity Order* may be defeated through such a meaningless expedient. To allow that outcome would create a blueprint for regulatory circumvention, effectively enabling every OVS operator to engage in exactly the kind of exclusive access arrangement that the FCC found to deter competition and cause consumers considerable harm. We decline OpenBand's invitation to be a party to that result.

B.

Having decided that OBL is an OVS operator bound by the FCC order, we consider finally whether OBL's arrangements

contravene that order. We start with the language of the order, which states that no OVS operator "shall enforce or execute any provision in a contract that grants it the exclusive right to provide any video programming service (alone or in combination with other services) to a MDU. Any such exclusivity clause shall be null and void." *Exclusivity Order* ¶ 31. Open-Band has conceded, at various points, that most of this definition is satisfied. OpenBand does not dispute, for instance, that Lansdowne is an MDU protected by the order. OpenBand also admitted before the district court that its easement (though not the TSA) "effectively bar[s] other providers of wired services from Lansdowne." Defs.' Br. in Supp. of Mot. to Dismiss 22.

Notwithstanding these concessions, OpenBand claims that it has not violated the *Exclusivity Order*. Its argument involves two steps. First, OpenBand asserts that each of the challenged arrangements—the TSA, CC&Rs, and easement—should be segregated and considered separately from one another before determining whether any of them actually violates the order. Second, OpenBand contends that none of the individual agreements actually does so. As we explain further below, OpenBand is incorrect at both steps of its reasoning.

1.

We shall first consider whether the TSA, CC&Rs, and easement should be considered separately for the purpose of determining whether the agreements include exclusivity clauses that run afoul of the order. OpenBand argues that we must consider these arrangements in isolation. This is because the order applies to exclusivity provisions contained in a "contract," and, by evaluating each agreement separately, OpenBand hopes to cordon off the exclusivity clauses in the easement (which it claims is not a contract), and focus the court's attention instead on the TSA (which it concedes is a contract, only one that it says contains no exclusivity clause).

OpenBand's divide-and-conquer approach must be exposed for what it really is: a sleight of hand designed to preserve

precisely the type of anti-competitive video monopoly that the FCC sought to prohibit. We decline to permit this machination for a straightforward reason: under Virginia law, "contemporaneous written agreements executed as part of the same transaction will be construed together as forming one contract." *Va. Hous. Dev. Auth. v. Fox Run Ltd.*, 497 S.E.2d 747, 752 (Va. 1998) (internal quotation mark omitted); *see James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004) ("[I]nterpretation of private contracts is a question of state law."). The TSA, CC&Rs, and easement easily satisfy this standard because they were each entered into within a short window of time in 2001, and each concerns the same basic transaction: OBL's agreement to provide telecommunications services to Lansdowne.

That the documents were designed to function together as a single agreement is further confirmed by the fact that the terms of each document "clearly contemplate the application of terms in the other[s]," such that the terms "may be viewed together as representing the complete agreement of the parties." *Va. Hous. Dev. Auth.*, 497 S.E.2d at 752-53. Indeed, the very thing that ties the agreements together is OpenBand's unabashed desire to secure exclusive access to the development. For example, the CC&Rs incorporate the terms of the easement, confirming that OBL enjoys "exclusive easements for access to and the installation [and] operation" of telecommunications systems. As discussed, the easement promises OBL the sole right to build and operate video infrastructure in Lansdowne such that "no other person or entity shall be entitled to" do the same. And tying together the entire arrangement, the TSA explicitly incorporates the terms of the CC&Rs by forbidding LHOA to "amend the CC&Rs such that the amendment would . . . have a materially adverse effect on OBL." Significantly, it is undisputed that if LHOA were to amend its CC&Rs to permit it to grant an easement to another video provider, that would have a "materially adverse effect" on OBL and therefore breach the TSA.

Thus, considering the TSA, CC&Rs, and easement together as the single, intertwining contract that it actually is, we have no difficulty concluding that it contains provisions granting OBL the "exclusive right to provide" video service to Lansdowne, in violation of the order. *Exclusivity Order* ¶ 31. As noted earlier, the purpose and effect of the agreement is to bar competing cable video providers from delivering service to the development by preventing them from ever building the infrastructure necessary to reach Lansdowne in the first place. *See ante* at 10-11. Thus, the provisions are among the type that the FCC identified as the "most exclusionary exclusivity clauses," as they "prohibit any other [provider] from any access whatsoever to the premises." *Id.* ¶ 1 n.2. All of the clauses effectuating this exclusive video arrangement are therefore "null and void." *Id.* ¶ 31.

2.

Even if we were to agree with OpenBand that the easement, CC&Rs, and TSA should be evaluated separately under the *Exclusivity Order*, we would nevertheless conclude that each agreement is independently a contract containing exclusivity provisions prohibited under the order.

With regard to the easement at the crux of this dispute, OpenBand raises a variety of arguments for why it does not violate the *Exclusivity Order* when considered in isolation. First, OpenBand argues that the order does not apply to exclusivity clauses in easements because easements are not contracts. As an initial matter, this argument is forfeited because OpenBand failed to argue it in the district court. *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993). In fact, Open-Band actually conceded the opposite before the district court, admitting that it is "undisputed" that "easements are contracts." Defs.' Reply in Supp. of Mot. to Dismiss 18; *see also* Tr. of Summ. J. Hr'g 26 (admitting that OpenBand "ha[s] a contractual provision in the form of a real property agreement that provides an exclusive right of enjoyment of the prop-

erty"). Moreover, even if we were to consider the argument on appeal, we would find OpenBand's initial concession correct: a deed of easement *is* a contract. *See Cantrell v. Appalachian Power Co.*, 139 S.E. 247, 248-49 (Va. 1927) (describing document granting an easement as a "contract"); *see also, e.g.*, *United States v. Sea Gate, Inc.*, 397 F. Supp. 1351, 1360 (E.D.N.C. 1975) ("[A] deed creating an easement by express reservation is a contract.").

Undeterred, OpenBand next argues that the *Exclusivity Order* is not meant to interfere with easements because the order is "explicit in limiting its reach to exclusivity clauses in contracts for video services, not real property rights." Appellants' Br. 31. Specifically, OpenBand points to Paragraph 37 of the *Exclusivity Order*, which states that "the rule we adopt today does not require that any new entrant be given access to any MDU. A MDU owner still retains the rights it has under relevant state law to deny [access to] a particular provider." But this paragraph quite obviously does not assist OpenBand's position because it protects the right of *property owners* to deny a cable provider access to their property, not the right of a cable provider to exclude its competitors. Nor is OpenBand aided by its reliance on Paragraphs 55 and 57 of the order, which state that the order "does not involve the permanent condemnation of physical property" and that video providers need not "jettison" use of their existing wires. Those provisions simply make clear that video providers are not required to give up or affirmatively share their existing infrastructure; the provisions in no way permit providers to completely exclude their competitors from accessing a property.

OpenBand's contention that the FCC's order does not extend to easements is also considerably undermined by the fact that the order specifically references two easements, attached to comments filed by AT&T, as "examples of exclusion." *Exclusivity Order* ¶ 10 & n.27. It would have been odd —to say the least—for the FCC to refer to two exclusive ease-

ments as illustrations of exclusivity clauses if, as OpenBand asserts, the FCC in fact intended not to reach such easements.

Nor can OpenBand defend the illogical result that would arise were we to accept its position that easements are exempt from the order. If OpenBand is correct, any cable provider would be able to frustrate the FCC's unequivocal prohibition on exclusivity clauses simply by structuring its exclusive arrangement in the form of an easement. An exception of such huge proportions would render the FCC's order nugatory, the dangers of which this very case makes clear.

OpenBand makes one last argument for why the easement does not violate the FCC's order. Retreating from its prior admission that the easement bars access by other cable providers, OpenBand argues now on appeal that the easement does not "absolutely" bar access to Lansdowne after all because "OBL has the right to grant subeasements." Appellants' Br. 30. To begin, this argument is also forfeited because OpenBand never raised it in the district court. *Muth*, 1 F.3d at 250. Moreover, even if not forfeited, the argument is belied by the record, for OpenBand has never represented that it would grant a subeasement to a competitor of its own good will. In point of fact, as already mentioned, an M.C. Dean executive testified in a deposition that, "would we object to [Verizon] coming into the community and running their infrastructure? I would say that we would."

Finally, even if the argument were not forfeited, and even if it were supported by the record, we would reject it in any event. The mere fact that OBL may voluntarily relinquish its exclusivity by granting a subeasement cannot mean that the easement is untouched by the FCC order. If that were so, the FCC order would never render any exclusivity clause null and void, since a party could always theoretically give up its claim of exclusivity. But that is not how the FCC order is written: the order instead prohibits "any provision in a contract that grants it the exclusive *right* to provide" video services to an

MDU. *Exclusivity Order* ¶ 31 (emphasis added). The easement grants OBL exactly that right, regardless of its future intentions. All provisions in the easement granting OBL the exclusive right to provide video services are therefore null and void, as are any such clauses in the TSA and CC&Rs.[8]

V.

In seeking to defend its exclusive access arrangement, OpenBand has engaged in what amounts to an elaborate game of regulatory subterfuge featuring an array of procedural defenses, the use of various corporate entities to escape the definition of an OVS operator, and an artifice to evade the FCC order by structuring its exclusive arrangement using a web of sub-agreements. The district court correctly pierced these arguments to recognize that OpenBand had set up just the kind of non-competitive video service monopoly—with all the attendant dangers of high prices and poor service—that the FCC banned in the *Exclusivity Order*. We accordingly affirm the grant of summary judgment in LHOA's favor.

Furthermore, lest there be any doubt, we underscore that in declaring null and void and enjoining enforcement of all exclusivity clauses in the challenged agreements as those clauses relate to the provision of wire-based cable services, the district court's order renders the clauses unenforceable against the homeowners association and individual homeowners alike. To endorse a contrary result would be to foster the very anti-competitive injuries in terms of price, quality, and

---

[8]Thus, for example, the TSA expressly provides that LHOA "shall not engage any other provider of Platform services." In addition, as explained above, the TSA contains a clause that guarantees OBL exclusive access to Lansdowne by preventing LHOA from amending its CC&Rs to permit other cable providers from building infrastructure in the development. The CC&Rs similarly provide that OBL's "rights with respect to the private utility system . . . and the services provided through such private utility system are exclusive, and no other Person may provide such services to the Property."

choice of service that prompted the FCC to enact the *Exclusivity Order* in the first place.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*