CONCURRING IN PART AND DISSENTING IN PART KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. Because I believe that the plaintiffs have sufficiently pleaded an exclusivity claim, I would reverse the district court’s denial of the plaintiffs’ motion seeking leave to file the second amended complaint on this claim as well as on the plaintiffs’ tying claim. Therefore, I respectfully dissent from Part II.C of the majority’s opinion. I. In its 2007 “Exclusivity Order” the Federal Communications Commission (“FCC”) found that “the greatest harm that exclusivity clauses cause residents of MDUs [multiple dwelling units] is that they deny those residents another choice of MVPD [multichannel video programming distributor] service and thus deny them the benefits of increased competition.” In the Matter of Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments, 22 FCC Red. 20235, 20244 (2007) (codified at 47 C.F.R. § 76.2000) (hereinafter “Exclusivity Order”). The FCC found that cable operators protected by exclusivity clauses faced no pressure to hold down their prices, to provide desired programming, or to offer low-cost bundles of video, voice, and Internet access services. Id. at 20244-45. Furthermore, the FCC found that exclusivity clauses had the potential to act as deterrents to competitors seeking to enter the marketplace. Id. at 20245. The FCC concluded that these clauses are proscribed by 47 U.S.C. § 548 because “[t]hat Section prohibits unfair methods of competition that have the purpose or effect of hindering significantly or preventing MPVDs from providing ‘satellite cable’ and/or ‘satellite broadcast’ programming to subscribers and consumers.” Id. at 20236. The FCC, therefore, prohibited cable operators or MVPDs from “enforce[ing] or execut[ing] any provision in a contract that grants it the exclusive right to provide any video programming service (alone or in combination with other services) to a MDU.” Id. at 20251 (emphasis added). The situation in this case presents exactly the problems the FCC sought to prevent in its Exclusivity Order. II. The plaintiffs argue that their factual allegations show that the cumulative effect of the Communications Service Agreements’ (“CSAs”) provisions is to create a de facto exclusivity arrangement in violation of the Exclusivity Order. Appellant Reply Br. at 7. The majority rejects the plaintiffs’ premise that the Exclusivity Order can be violated by a de facto contractual arrangement, and instead reads the prohibition as applying only to specific clauses that explicitly create exclusivity standing alone. This interpretation of the regulation ignores the purpose of the Exclusivity Order and the principles of Tennessee contract law that govern our interpretation of the CSAs. The CSAs are interpreted pursuant to Tennessee law. Cf. Ferro Corp. v. Garrison Indus., Inc., 142 F.3d 926, 935 (6th Cir. 1998). “Under Tennessee law ... the ‘cardinal rule [in interpreting contracts] ... is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles.’ ” Frizzell Constr. Co. v. Gatlinburg, L.L.C., 9 S.W.3d 79, 85 (Tenn. 1999) (second and third alteration in original) (quoting Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc., 521 S.W.2d 578, 580 (Tenn. 1975)). “In addition, a contract’s provisions must be interpreted in the context of the entire contract, ‘viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illustrate another.’” D&E Constr. Co. v. Robert J. Denley Co., 38 S.W.3d 513, 519 (Tenn. 2001) (quoting Frizzell Constr. Co., 9 S.W.3d at 85). The CSAs both contain an explicit exclusivity clause. R. 99-3 (Tollgate CSA at 1) (Page ID #1492) (“Association has chosen Crystal Clear Technologies to operate and maintain the System, and to provide Basic Services (as further defined below) to each home and multi-family dwelling unit in Tollgate Village (‘Home’) on an exclusive basis consistent with the terms of this Agreement and applicable law.” (emphasis added)); R. 99-4 (Bridgemore CSA at 1) (Page ID #1527) (“Association has chosen Crystal Clear Technologies, LLC to operate and maintain the System, and to provide Basic Services (as further defined below) to each home and multifamily dwelling unit in Bridgemore Village (‘Home’) on an exclusive basis consistent with the terms of this Agreement and applicable law.” (emphasis added)). The defendants argue that these exclusivity clauses are “one-off phrase[s]” and the remaining provisions “mandate a non-exclusive arrangement and homeowner access to other providers.” Corrected Br. of Ap-pellees Crystal Clear Techs., LLC and Carbine & Assocs., LLC, adopted by Ap-pellees Tollgate Farms, LLC and Bridge-more Dev. Grp., LLC at 14 n.6. The defendants are correct that the exclusivity clauses must be interpreted in light of the other contract provisions, D&E Constr. Co., 38 S.W.3d at 519, and that some of these provisions do contemplate the theoretical provision of MVPD services by alternative providers, R. 99-3 (Tollgate CSA at 7) (Page ID #1498); R. 99-4 (Bridge-more CSA at 7) (Page ID #1533). In the context of the entire contract, however, these exclusivity clauses are clearly designed to “prohibit any other MVPD from any access whatsoever to the premises of the MDU building or real estate development,”[1] Exclusivity Order at 20236 n.2. First, the GSAs refer to easements that Crystal Clear Technologies obtained in each MDU. R. 99-3 (Tollgate CSA at 1) (Page ID #1492); R. 99-4 (Bridgemore CSA at 7) (Page ID #1527). The plaintiffs allege that these easements are exclusive and prevent any alternative provider from distributing services in the MDUs. R. 99-1 (Proposed Second Amended Complaint at 27) (Page ID #1467). To support this factual allegation, the plaintiffs have proffered a letter from the current owners of the Bridgemore development discussing the exclusive easements; R. 99-7 (Gluck Letter at 3) (Page ID #1626). Under Tennessee law, documents referred to in a written contract “may be properly considered in the construction of the contract.” Lasco Inc. v. Inman Constr. Corp., 467 S.W.3d 467, 473 (Tenn. Ct. App. 2015) (internal quotation marks omitted) (quoting McCall v. Towne Square Inc., 503 S.W.2d 180, 183 (Tenn. 1973)). Thus, the references to these exclusive easements support the plaintiffs’ claim that the CSAs violate the Exclusivity Order. Second, other contractual provisions limit the ability of homeowners to communicate directly with alternate service providers, and vice-versa, ancl instead require communications to be funneled through Crystal Clear Technologies.[2] R. 99-3 (Tollgate CSA at 8) (Page ID #1499); R. 99-4 (Bridgemore CSA at 8) (Page ID #1534). Third, the CSAs allow Crystal Clear Technologies to charge alternative providers fees in order to offer services to homeowners. R. 99-3 (Tollgate CSA at 8) (Page ID #1499); R. 99-4 (Bridgemore CSA at 8) (Page ID #1534). Lastly, the CSAs bind the homeowners for twenty-five years and automatically renew for another twenty-five years; the homeowners cannot terminate the agreements until after the first twenty-five year period and must provide at least one year’s notice to do so. R. 99-3 (Tollgate CSA at Í6) (Page ID #1507); R. 99-4 (Bridgemore CSA at 17) (Page ID #1543). Collectively, these provisions, coupled with the explicit exclusivity clauses, demonstrate that the cumulative purpose and effect of the CSAs is to create a prohibited exclusivity arrangement-.[3] When viewing the CSAs as a whole, it is clear that “the purpose and effect of the agreement is to bar competing cable video providers from delivering service to the development by preventing them from ever building the infrastructure necessary to reach [the MDUs] in the first place.” Lansdowne on the Potomac Homeowners Ass’n v. OpenBand at Lansdowne, LLC, 713 F.3d 187, 205-06 (4th Cir. 2013). The majority seeks to distinguish the facts alleged in this case from the Fourth Circuit’s decision in Lansdowne in which our sister circuit concluded that a contract very similar to the one in this case violated the Exclusivity Order. 713 F.3d at 207. The majority points to differences that create no meaningful distinctions. Like the contested agreements at issue in Lans-downe, the CSAs here have explicit exclusivity clauses. Furthermore, as in Lans-downe, when the CSAs are interpreted pursuant to applicable state law the clear conclusion is that they create a prohibited exclusivity arrangement notwithstanding some of the language in the CSAs to the contrary. When interpreted as a whole, the agreement produces “precisely the type of anti-competitive monopoly that the FCC sought to prohibit.” Lansdowne, 713 F.3d at 205. III. Defendants Tollgate Village Association Inc. and Bridgemore Village Owners’ Association Inc.—the respective homeowners’ associations of the MDUs—argue that the plaintiffs lack standing to assert a derivative claim against them. Br. of Tollgate Vill. Ass’n Inc. & Bridgemore Vill. Owners’ Ass’n Inc. at 29. The majority did not need to reach this argument. I do, and conclude that the plaintiffs are bringing a direct claim—not a derivative claim—and therefore this argument is inapposite. Under Tennessee law, the difference between a direct and a derivative claim is premised on “the nature of the wrong and to whom the relief should go.” Keller v. Estate of McRedmond, 495 S.W.3d 852, 876 (Tenn. 2016) (quoting Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1039 (Del. 2004)). In a derivative suit, the wrong is suffered by the corporation and the harm to the shareholder is “merely incidental to the wrong suffered by the corporation and affects all stockholders alike.” Id. at 867 (internal quotation marks omitted). In contrast, in a direct action, the shareholder is the one who suffered the injury and any recovery would go to that injured shareholder. Id. at 868-69. Here, the plaintiffs are asserting a direct action. They allege that they have directly suffered injuries, as opposed to the homeowners’ associations. See, e.g., R. 99-1 (Proposed Second Amended Complaint at 14) (Page ID #1454). Any recovery that the plaintiffs would win would inure to their benefit and not to the benefit of the homeowners’ associations. Consequently, this is a direct claim under Tennessee law, and the argument of the homeowners’ associations about the plaintiffs’ lack of standing to assert a derivative claim is misplaced. IV. For the foregoing reasons, I respectfully dissent from Part II.C of the majority’s opinion, and I would reverse the district court’s denial of the plaintiffs’ motion seeking leave to file the second amended complaint on the plaintiffs’ exclusivity claim as well as on the plaintiffs’ tying claim. .The majority, relies on a footnote in the Exclusivity Order to construe narrowly the prohibition on exclusivity clauses, It is true that the Exclusivity Order is limited to "building exclusivity clauses." Exclusivity Order at 20236 n.2. The FCC has defined building exclusivity clauses as clauses that "prohibit any other MVPD from any access whatsoever to the premises of the MDU building or real estate development.” Id. Here, the provisions in the CSAs create this outcome de facto and therefore must fall within the parameters of the Exclusivity Order, In other words, the FCC has defined building exclusivity clauses as clauses creating outcome X. The clauses, here also produce outcome X, Therefore, these clauses must be subject to the Exclusivity Order because the underlying purpose of 47 U.S.C. § 548 and the Exclusivity Order would be eviscerated if parties could avoid the prohibition on exclusivity clauses by creating an exclusivity arrangement via the interaction of multiple contractual clauses as opposed to one clause Standing on its own. . This is different from the exclusive marketing arrangements created by the CSAs, R, 99-3 (Tollgate CSA at 6) (Page ID #1497); R. 99-4 (Bridgemore CSA at 6) (Page ID #1532); which are permitted by the FCC.. In the Matter of Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments: Second Report and Order, 25 FCC Red. 2460, 2471-73 (2010) (hereinafter “Bulk Billing and Exclusive Marketing Arrangements Order"). . The plaintiffs also'point to the provision in each CSA that requires them to pay Crystal Clear Technologies regardless of whether they actually use the company’s services. Appellants Br. at 8; R, 99-3 (Tollgate CSA at 10) (Page ID #1501); R. 99-4 (Bridgemore CSA at 10) (Page ID #1536). The FCC allows such mandatory fees as part of acceptable bulk billing arrangements. Bulk Billing and Exclusive Marketing Arrangements Order at 2465, Thus, this provision on its own does not support the plaintiffs’ argument. The existence of a bulk billing arrangement, however, does not immunize the CSAs from the Exclusivity Order. Bulk billing arrangements must comply with the prohibitions articulated in the Exclusivity Order. Id. at 2465 & n.15. The FCC distinguished acceptable bulk billing arrangements from prohibited exclusivity clauses because acceptable bulk billing arrangements do not prevent alternative providers from providing services to homeowners nor do they stop homeowners from purchasing services from other providers. Id. at 2468.