RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0245p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

COURTNEY CATES; BRIAN STOVER; JASON MILLER, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

CRYSTAL CLEAR TECHNOLOGIES, LLC; CARBINE & ASSOCIATES, LLC; TOLLGATE VILLAGE ASSOCIATION INC.; BRIDGEMORE VILLAGE OWNERS' ASSOCIATION INC.; BRIDGEMORE DEVELOPMENT GROUP, LLC; TOLLGATE FARMS, LLC,

*Defendants-Appellees*.

No. 16-6714

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:16-cv-00008—Aleta Arthur Trauger, District Judge.

Argued: July 26, 2017

Decided and Filed: October 30, 2017

Before: COLE, Chief Judge; BATCHELDER and MOORE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Benjamin Andrew Gastel, BRANSTETTER STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellants. D. Alexander Fardon, RILEY WARNOCK & JACOBSON, PLC, Nashville, Tennessee, for Appellees Crystal Clear Technologies and Carbine & Associates. Valerie Diden Moore, BUTLER SNOW LLP, Nashville, Tennessee, for Appellees Tollgate Village Association and Bridgemore Village Owners' Association. **ON BRIEF:** Benjamin Andrew Gastel, BRANSTETTER STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellants. D. Alexander Fardon, RILEY WARNOCK & JACOBSON, PLC, Nashville, Tennessee, Craig V. Gabbert, Jr., BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellees Crystal Clear Technologies and Carbine & Associates.

Valerie Diden Moore, BUTLER SNOW LLP, Nashville, Tennessee, for Appellees Tollgate Village Association and Bridgemore Village Owners' Association.

COLE, C.J., delivered the opinion of the court in which BATCHELER, J., joined in all but Part II.B., and MOORE, J., joined in all but Part II.C.  BATCHELDER, J. (pp. 11–14), delivered a separate opinion concurring in part and dissenting from Part II.B.  MOORE, J. (pp. 15–20), delivered a separate opinion concurring in part and dissenting from Part II.C.

———————————

**OPINION**

———————————

COLE, Chief Judge.  The three named plaintiffs brought a purported class action alleging that the developers of their neighborhoods created agreements that violated both state and federal law by requiring the neighborhoods' homeowners to pay for basic telecommunications services provided by Crystal Clear Technologies, LLC ("Crystal Clear"), an entity owned and controlled by the developers.  The district court dismissed the plaintiffs' federal claims for failure to state a claim and subsequently denied as futile the plaintiffs' motion seeking leave to file an amended complaint.  We affirm in part and reverse in part the district court's denial of the plaintiffs' motion seeking leave to file an amended complaint.

## I.  FACTS AND PROCEDURAL HISTORY

The plaintiffs are homeowners in three centrally-planned neighborhoods in Thompson's Station, a small town in Williamson County, Tennessee.  The three neighborhoods, Canterbury, Bridgemore, and Tollgate, have hundreds of houses and over a thousand homeowners.

Carbine & Associates, LLC, developed the neighborhoods through affiliated companies, Bridgemore Development Group, LLC, Tollgate Farms, LLC, and Hood Development, LLC. The developers also established and controlled owners' associations for the neighborhoods. However, the developers have since transferred control of the owners' associations to third-party entities not controlled by either the developers or homeowners.

From 2006 to 2007, while under the developers' control, the owners' associations each entered into communications services agreements (the "Agreements") with Crystal Clear.  The Agreements grant Crystal Clear the right to provide telecommunications services to the

neighborhoods for twenty-five years, with an option for Crystal Clear to unilaterally renew for an additional twenty-five years. In addition, the Agreements authorize Crystal Clear to be the exclusive agent for homeowners in procuring services from any outside providers and grant Crystal Clear the exclusive right to market services within the neighborhoods. Under the Agreements, homeowners must pay the owners' associations a monthly assessment fee, which the associations then use to pay Crystal Clear for basic telecommunications services. Homeowners must pay the fee whether they use Crystal Clear's services or not. In addition, homeowners must make a one-time payment of $1,500 to Crystal Clear for the cost of constructing the telecommunications infrastructure in the neighborhoods. To facilitate the infrastructure's construction, Crystal Clear also obtained a non-exclusive franchise agreement with Thompson's Station that permitted Crystal Clear to use the service easements within the neighborhoods.

Prior to executing the Agreements, Crystal Clear had no experience in the telecommunications-services industry. To provide services to the neighborhoods, Crystal Clear contracts with another provider, DirecTV, and charges a premium to homeowners in addition to the rate negotiated with DirecTV. Further, Crystal Clear does not provide services outside of the neighborhoods at issue in this case.

The plaintiffs brought this suit and subsequently filed their first amended complaint, alleging both state and federal claims. The plaintiffs claimed that the Agreements constituted self-dealing, unjust enrichment, unconscionability, unlawful tying, market allocation, and unlawful exclusivity.

The defendants moved to dismiss, arguing that the first amended complaint failed to assert allegations necessary for the federal claims and that the plaintiffs lack standing to bring claims on behalf of the owners' associations. The district court dismissed the first amended complaint under Federal Rule of Civil Procedure 12(b)(6) without addressing the standing argument and declined to exercise supplemental jurisdiction over the remaining state-law claims.

The plaintiffs then moved under Federal Rule of Civil Procedure 59 to alter or amend the judgment and under Rule 15 for leave to file a second amended complaint that asserted the same

federal claims.  The district court denied the plaintiffs' motion after determining that the second amended complaint would fail to survive a motion to dismiss and was thus futile.  The plaintiffs timely appealed from both the district court's dismissal and its refusal to allow the second amended complaint.  However, the plaintiffs agree that the second amended complaint reflects the plaintiffs' most recent and developed pleading for purposes of this appeal.  Accordingly, we consider only whether the district court erred in refusing to allow the second amended complaint under Rule 59 and Rule 15.  Furthermore, the plaintiffs challenge only the district court's decisions regarding their tying and exclusivity claims.  Therefore, we do not address the dismissal of the market allocation claim.

## II.  ANALYSIS

### A.  Standard of Review

We review de novo the denial of a motion seeking to amend a complaint where the denial is based on the determination that the amended complaint is futile because it would fail under a motion to dismiss.  *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 572 (6th Cir. 2008).

"To survive a motion to dismiss, a plaintiff must allege facts that state a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise a right to relief above the speculative level."  *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016) (citation and internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "This standard 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct.]'"  *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383 (6th Cir. 2016) (quoting *Twombly*, 550 U.S. at 556).  This court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Bickerstaff*, 830 F.3d at 396 (citation omitted).

**B. Unlawful Tying Under the Sherman Act**

"A tying arrangement is defined as an agreement by a party to sell one product [a tying product] . . . only on the condition that the buyer also purchases a different (or tied) product . . . ." *Mich. Division-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 732 (6th Cir. 2008) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958)). "The typical tying case involve[s] a seller's attempt to exploit its economic power over one product or in one market to force a less desirable, tied product on a buyer." *Id.* (internal quotation marks omitted). "Illegal tying therefore occurs only if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Id.* (internal quotation marks omitted). With regard to the impact on the tied market, "the controlling consideration is simply whether a total amount of business, substantial enough . . . so as not to be merely de minimis, is foreclosed to competitors by the tie . . . ." *Fortner Enter., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501 (1969). This latter requirement "makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie." *Id.*

Under their tying claim, the plaintiffs allege that the developers used their market power over the sale of homes in these neighborhoods to force the homeowners to purchase telecommunications services from Crystal Clear, thereby harming competition for the provision of telecommunications services and violating the Sherman Act, 15 U.S.C. § 1. The district court found that the first amended complaint failed to state a tying claim because it did not define the tying product market in alleging the defendants' market power in the sale of homes. The second amended complaint addressed this by defining the tying product market as centrally-planned communities within Thompson's Station. The district court then determined that the second amended complaint alleges market power in a defined market, but that it is futile because it fails to allege a substantial impact on the *relevant* tied market.

On appeal, the plaintiffs contest this, arguing that the second amended complaint pleads a substantial impact on the tied market by alleging that the defendants harmed competition for the provision of telecommunications services. The defendants contend that the plaintiffs only pleaded a substantial impact on "telecommunications services in the Neighborhoods" rather than

"commerce in the general market within which [telecommunications services] [are] sold." (Crystal Clear Br. 19–20.)

This court must therefore determine whether the plaintiffs pleaded a substantial impact within the relevant market for telecommunications services. In doing so, this court is mindful that it must "construe the complaint in the light most favorable to the plaintiff . . . and draw all reasonable inferences in favor of the plaintiff." *See Bickerstaff*, 830 F.3d at 396. While the plaintiffs allege that the arrangement "substantial[ly]" affected "the sale of telecommunications in the Neighborhood[s]," the plaintiffs also allege more broadly that the arrangement "ha[s] harmed competition for the provision of telecommunications." (R. 99-1, ¶¶ 90, 94.) The exact amount of commerce impacted by the tying arrangement is unclear at this stage, but the plaintiffs have alleged that the neighborhoods, and thus the list of potential plaintiffs, include hundreds of houses and over 1,000 homeowners subject to the arrangement.

We can reasonably infer that alleging harm to particular neighborhoods equates to alleging harm to the general market that covers those neighborhoods. By alleging that the Agreements forced each household to pay one-time infrastructure fees of at least $1,500 and monthly assessment fees for Crystal Clear's services, the plaintiffs have pleaded an amount of commerce that would be substantial in both the neighborhoods and the telecommunications services market that covers those neighborhoods in Thompson's Station, Williamson County, or beyond. *See Fortner*, 394 U.S. at 502 ("[W]e cannot agree with respondents that a sum of almost $200,000 is paltry or 'insubstantial.'"); *Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1130 & n.8 (6th Cir. 1981) (holding that $140,000 over three years, "amount[ing] to little more than $40,000 a year," is not insubstantial); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1578 (11th Cir. 1991) (holding that $30,000 to $70,000 is "clearly substantial"). We therefore conclude that the plaintiffs have pleaded a substantial impact on the relevant tied market.

The defendants argue that, even if the plaintiffs sufficiently pleaded substantial harm on the relevant tied market, the district court erred in concluding that the plaintiffs' defined market for the tying product (the sale of homes) is proper. The proper definition of a tying product market and whether a defendant has market power within that market are fact-intensive questions best addressed following discovery. *Mich. Division-Monument*, 524 F.3d at 733. This is

because the inquiry requires considering both the attributes of the product that make it unique from others and the geographic market within which consumers may seek comparable products. *See id.* The plaintiffs allege that the neighborhoods represent the majority of centrally-planned neighborhoods that are located in a small-town setting in a county that is otherwise filled with more densely populated communities. The plaintiffs further allege that the neighborhoods are unique from others because they provide the homeowners with access to superior area schools and local covenants that restrict home construction to houses typically purchased by middle to upper-middle income households. As the district court correctly noted, the plaintiffs' allegations on the tying product market are plausible on their face.

### C.  Exclusivity Under the Federal Telecommunications Act

The Federal Communications Commission ("FCC") has explicit authority to impose regulations specifying exclusive conduct that the Federal Telecommunications Act prohibits. *See* 47 U.S.C. § 548(c)(1); *see also Nat. Cable & Telecomm. Ass'n v. FCC*, 567 F.3d 659, 664–65 (D.C. Cir. 2009). Pursuant to this authority, the FCC issued the 2007 "Exclusivity Order" barring any cable distributor from "enforc[ing] or execut[ing] any provision in a contract that grants it the exclusive right to provide any video programming service (alone or in combination with other services) . . . ." *In the Matter of Exclusive Service Contracts For Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*, 22 FCC Rcd. 20235, 20251 (2007) (codified by 47 C.F.R. § 76.2000(a)) (hereinafter "Exclusivity Order").

The plaintiffs allege that the Agreements violate the Exclusivity Order by making Crystal Clear the exclusive provider of services for the neighborhoods. The district court dismissed this claim, as alleged in the first amended complaint, noting that both the Agreements and the allegations contradicted the plaintiffs' claim that the Agreements were exclusive contracts.

As evidence of the arrangement's exclusivity, the plaintiffs submitted with their proposed second amended complaint the Agreements and a letter sent by MBSC, the new owner of the Bridgemore development, stating that Crystal Clear refused "to give up its exclusive easements that enable it to be the only provider in Bridgemore." (Letter from MBSC, R. 99-7, PageID 1626.) The district court concluded that the second amended complaint reiterated the allegations

from the previous complaint and would therefore fail under a motion to dismiss. In addition, the district court found that the second amended complaint and the plain text of the Agreements contradicted the letter submitted by the plaintiffs.

"The law is clear that [courts] may consider [a document] which was attached to the [c]omplaint . . . in determining whether dismissal is proper." *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (per curiam); *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014). Further, "[w]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Williams*, 498 F. App'x at 536 (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998) (stating that this rule is "well-settled")).

The plaintiffs allege that the Agreements make Crystal Clear the exclusive provider by creating unlawful and unreasonable barriers to entry, such as requiring homeowners to pay for services regardless of usage, referencing Crystal Clear's easements, and by granting Crystal Clear the exclusive right to negotiate with providers about access to deliver services to the neighborhoods. According to the plaintiffs, the cumulative effect of the barriers makes it both economically and practically unfeasible for any other provider to offer its services. The plaintiffs point to both the Agreements' terms, which state that Crystal Clear will operate on an exclusive basis, and the MBSC letter, which describes Crystal Clear's easements as exclusive and barring other providers.

As the district court noted, there are several contradictions amongst the plaintiffs' allegations and the Agreements' terms. The plaintiffs allege both that the Agreements make Crystal Clear the exclusive provider and that Crystal Clear is not truly a provider, contracting with DirecTV to be the actual provider. The plaintiffs note the Agreements' terms describing the arrangement as "exclusive," but the Agreements' terms mandate that homeowners must have access to other providers. The plaintiffs' allege both that Crystal Clear's easements are "exclusive" and that they are part of a non-exclusive franchise agreement. We conclude that these contradictions foreclose the plaintiffs' exclusivity claim.

The plaintiffs claim more than explicit exclusivity; they also claim that the structure and cumulative effect of the arrangement creates an exclusive provider relationship. But such allegations are insufficient to state an exclusivity claim. The prohibition imposed by the Exclusivity Order is limited by its terms to "building exclusivity clauses." Exclusivity Order, 22 F.C.C. Rcd. at 20236 n.2. Such clauses "appear in contracts between [multichannel video programming distributors ("MVPDs")] and [multiple dwelling unit ("MDU")] owners or other real estate developments" and "prohibit any other MVPD from any access whatsoever to the premises of the MDU building or real estate development." *Id.* Assuming Crystal Clear is an MVPD, the plaintiffs do not allege facts sufficient to show that the Agreements prohibit any other MVPD from "any access whatsoever" to the neighborhoods. Indeed, the Agreements specifically mandate that alternative providers be given access to the neighborhoods.

The plaintiffs rely on a Fourth Circuit decision holding a defendant liable for violating the Exclusivity Order, but that decision is inapposite. *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC,* 713 F.3d 187, 205–06 (4th Cir. 2013). As the Fourth Circuit found, the relevant contract in that case contained explicit exclusivity clauses. *Id.* Those clauses were contained in an easement that, unlike here, expressly granted the cable provider the sole right to develop telecommunications infrastructure. *Id.* at 205. And applicable state law required the court to construe the easement, along with a series of related agreements, as a "single, intertwining contract" subject to the Exclusivity Order, notwithstanding the defendant's argument that easements are not "contracts" subject to the order. *Id.* Interpreting the easement as part of a contract, the Fourth Circuit had "no difficulty" concluding that the contract contained explicit exclusivity clauses in violation of the Exclusivity Order. *Id.* In this case, by contrast, the plaintiffs do not allege facts sufficient to show that either the Agreements or easements at issue contain explicit exclusivity clauses. We therefore conclude that the plaintiffs have not sufficiently pleaded an exclusivity claim.

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's denial of the plaintiffs' motion seeking leave to file the second amended complaint on plaintiffs' tying claim; we affirm the district court's denial of the plaintiffs' motion seeking leave to file the second amended

complaint on plaintiffs' exclusivity claim; and we remand this action to the district court for further proceedings consistent with this opinion.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part. I concur with the majority's opinion regarding Plaintiffs' exclusivity claim. Plaintiffs have failed to allege that the communications services agreements (the "Agreements") grant Crystal Clear an improper "exclusive right to provide" telecommunication services to the developments. However, in my view, despite multiple opportunities to do so, Plaintiffs have failed to articulate a suitable market in which the purported antitrust violation took place. Therefore, with respect to Plaintiffs' antitrust tying claim, I respectfully dissent from Part II.B of the majority's opinion and would hold that Plaintiffs have failed to state a claim upon which relief can be granted.[1]

I would find that Plaintiffs have failed to state an antitrust tying claim because they do not allege that the purported tying arrangement "affects a substantial volume of commerce in the tied market." *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 732 (6th Cir. 2008) [hereinafter *Monument Builders*] (citation omitted). With respect to the tied market, Plaintiffs allege only that "[t]he amount of interstate commerce affected in the market for the sale of lots in the Neighborhood and/or the sale of telecommunications in the Neighborhood is substantial." While the majority infers "that alleging harm to particular neighborhoods equates to alleging harm to the general market that covers those neighborhoods," it cites no case, and I have found none, to support that conclusion.[2] Plaintiffs must "defin[e] the

---

[1]As an initial matter, the antitrust and exclusivity claims come to us, in part, as an appeal of a post-judgment motion to amend. "When a party seeks to amend a complaint after an adverse judgment, it thus must shoulder a heavier burden. Instead of meeting only the modest requirements of Rule 15, the claimant must meet the requirements for reopening a case established by Rules 59 or 60." *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 616 (6th Cir. 2010) (citations omitted). Because I would find that the district court did not err by dismissing Plaintiffs' antitrust and exclusivity claims, I would also find that the district court did not abuse its discretion by denying Plaintiffs' motion to set aside judgment and amend the complaint.

[2]The Tenth Circuit recently rejected a similar argument as "an outdated view of the law," while reviewing a Federal Rule of Civil Procedure 50(b) motion in *In re: Cox Enterprises, Inc.*, 871 F.3d 1093, 1098 (10th Cir. 2017). Specifically, the *Cox* plaintiffs argued that "because Cox makes a substantial amount of money on [the tied product], the tie necessarily has the requisite potential for anticompetitive effects in the [tied] market." *Id.* The Tenth Circuit disagreed, explaining that "making money from a tying arrangement doesn't violate § 1 of the Sherman Act unless the defendant, by doing so, has actually or potentially foreclosed or injured competition in the tied-product market." *Id.* at 1106. "Because tying claims often present little or no potential to harm competition—

relevant *product* market and demonstrat[e] the defendant's power in that market," and they "must also define the relevant *geographic* market and demonstrate that the defendant's actions produced anticompetitive effects in that defined area." *Id.* at 733 (citing *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001)). "The selected geographic market must 'both correspond to the commercial realities of the industry and be economically significant.'" *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37 (1962)).

"[T]he Neighborhood" is not a relevant geographic market. As the district court explained, the relevant geographic market cannot be the area in which Crystal Clear allegedly has exclusive control; it is self-evident that the purported tying arrangement would have a substantial effect in the location where all purchasers of both the tying and tied product reside, i.e. the *neighborhoods*. This is a facile "pleading maneuver[]" that artificially narrows the broader economic and geographic market for telecommunication services to create a "fictitious market" in which *any* sales by Crystal Clear would cause a substantial effect. *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 633 (5th Cir. 2002). A geographic market must reflect the commercial realities of the telecommunication-services industry and be economically significant. Plaintiffs do not allege that the neighborhoods—three residential developments in Thompson's Station, a suburb of Nashville—correspond to the commercial realities of the telecommunication-services market, which exists at least in Thompson's Station if not in the larger geographic area around Nashville. Nor have Plaintiffs alleged facts showing that the telecommunication-services sales in those three residential developments are economically significant in relation to the broader telecommunication-services market in Thompson's Station or nearby Nashville. *See Monument Builders*, 524 F.3d at 736; *see also Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 745 (5th Cir. 2010).

Many cases illustrate this rule. For example, in *Monument Builders*, 524 F.3d at 737, we rejected a tying claim because the plaintiffs' definition of the relevant geographic market was too narrow. The *Monument Builders* plaintiffs alleged that the defendant cemeteries improperly

---

and thus, no antitrust concerns—plaintiffs alleging per se unlawful tying arrangements must do more to meet the foreclosure element than point to a dollar amount." *Id.* at 1106–07 (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15–16 (1984)).

required consumers to purchase a burial memorial from the cemeteries, once they had purchased a burial plot. We rejected the plaintiffs' allegation that the relevant geographic market was "each individual cemetery," *id.* at 734, because the "uniqueness of location is not in itself adequate to establish market power," *id.* at 733 (quoting *Baxley-DeLamar Monuments, Inc. v. Am. Cemetery Ass'n*, 938 F.2d 846, 852 (8th Cir. 1991)). Moreover, we found that such a definition improperly merged the geographic-market analysis and the product-market analysis into one determination and made proof of a substantial effect on the relevant market unnecessary, holding that: "There can be no competition for the sale of burial lots within a market that contains only one provider of burial lots. Market power under these circumstances would be unavoidable." *Id.* at 734–35; *see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 515 (3d Cir. 1998) (finding that "non-contiguous, gerrymandered geographic market consisting solely of the areas surrounding [certain] pharmacies in suburban Philadelphia," without reference to a market perceived by consumers and suppliers, failed as a matter of law (citing *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 727 (3d Cir. 1991)).

In support of its holding, the *Monument Builders* court relied on *Apani Southwest*, 300 F.3d at 626–27, which addressed a plaintiff's definition of a geographic market as twenty-seven City-owned facilities in Lubbock, Texas, where Coca-Cola was the exclusive provider of nonalcoholic beverages. The *Apani* court characterized the plaintiff's allegations as an attempt "to artificially narrow a broader economic market" and rejected the tying claim because the alleged geographic market "did not correspond to the commercial realities of the industry and was not economically significant." *Id.* at 633; *see also Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560–61 (8th Cir. 1998) (rejecting the trucker plaintiffs' allegation that the relevant geographic market for "unloading services" was "the Supervalu warehouse in Urbandale, Iowa, which is a suburb of Des Moines," because the "stated geographic market is too narrow to support a claim of an antitrust violation").

Finally, in the more recent case of *Wampler v. Southwest Bell Telephone Co.*, 597 F.3d 741 (5th Cir. 2010), the Fifth Circuit rejected a Sherman Act conspiracy claim in which the resident plaintiffs alleged that the relevant geographic market was a single multi-unit dwelling ("MDU") where AT&T had exclusive access to the communications infrastructure entering the

building.  *Id.* at 743.  The *Wampler* court held that an MDU was not a relevant geographic market, because "given the competition that exists between MDU owners, the competition that exists between service providers, and given the highly mobile nature of today's society, . . . a single MDU is [not] so segregated as to be economically significant and thus represent[] a plausible geographic market." *Id.* at 746; *cf. E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 444–47 (4th Cir. 2011) (finding sufficient Kolon's allegation that "the relevant geographic market was 'worldwide supply of para-aramid fiber to commercial purchasers in the United States,'" because Kolon "pled plausible reasons for limiting the geographic market to the United States").

Similarly, "the Neighborhood" is not a relevant geographic market for the tied product (telecommunication services) at issue here.  Plaintiffs do not allege that "the Neighborhood" has any relationship to the commercial realities of the telecommunication-services industry or is economically significant in the telecommunication-services market.  Plaintiffs, therefore, have failed to allege a relevant geographic market for the sale of telecommunication services, and their allegations are insufficient to make out a tying claim.

For the foregoing reasons, I concur in part and dissent in part.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. Because I believe that the plaintiffs have sufficiently pleaded an exclusivity claim, I would reverse the district court's denial of the plaintiffs' motion seeking leave to file the second amended complaint on this claim as well as on the plaintiffs' tying claim. Therefore, I respectfully dissent from Part II.C of the majority's opinion.

**I.**

In its 2007 "Exclusivity Order" the Federal Communications Commission ("FCC") found that "the greatest harm that exclusivity clauses cause residents of MDUs [multiple dwelling units] is that they deny those residents another choice of MVPD [multichannel video programming distributor] service and thus deny them the benefits of increased competition." In the Matter of Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments, 22 FCC Rcd. 20235, 20244 (2007) (codified at 47 C.F.R. § 76.2000) (hereinafter "Exclusivity Order"). The FCC found that cable operators protected by exclusivity clauses faced no pressure to hold down their prices, to provide desired programming, or to offer low-cost bundles of video, voice, and Internet access services. *Id.* at 20244–45. Furthermore, the FCC found that exclusivity clauses had the potential to act as deterrents to competitors seeking to enter the marketplace. *Id.* at 20245. The FCC concluded that these clauses are proscribed by 47 U.S.C. § 548 because "[t]hat Section prohibits unfair methods of competition that have the purpose or effect of hindering significantly or preventing MPVDs from providing 'satellite cable' and/or 'satellite broadcast' programming to subscribers and consumers." *Id.* at 20236. The FCC, therefore, prohibited cable operators or MVPDs from "enforce[ing] or execut[ing] *any* provision in a contract that grants it the exclusive right to provide any video programming service (alone or in combination with other services) to a MDU." *Id.* at 20251 (emphasis added). The situation in this case presents exactly the problems the FCC sought to prevent in its Exclusivity Order.

**II.**

The plaintiffs argue that their factual allegations show that the cumulative effect of the Communications Service Agreements' ("CSAs") provisions is to create a de facto exclusivity arrangement in violation of the Exclusivity Order. Appellant Reply Br. at 7. The majority rejects the plaintiffs' premise that the Exclusivity Order can be violated by a de facto contractual arrangement, and instead reads the prohibition as applying only to specific clauses that explicitly create exclusivity standing alone. This interpretation of the regulation ignores the purpose of the Exclusivity Order and the principles of Tennessee contract law that govern our interpretation of the CSAs.

The CSAs are interpreted pursuant to Tennessee law. *Cf. Ferro Corp. v. Garrison Indus., Inc.*, 142 F.3d 926, 935 (6th Cir. 1998). "Under Tennessee law . . . the 'cardinal rule [in interpreting contracts] . . . is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles.'" *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999) (second and third alteration in original) (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). "In addition, a contract's provisions must be interpreted in the context of the entire contract, 'viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illustrate another.'" *D&E Constr. Co. v. Robert J. Denley Co.*, 38 S.W.3d 513, 519 (Tenn. 2001) (quoting *Frizzell Constr. Co.*, 9 S.W.3d at 85).

The CSAs both contain an explicit exclusivity clause. R. 99-3 (Tollgate CSA at 1) (Page ID #1492) ("Association has chosen Crystal Clear Technologies to operate and maintain the System, and to provide Basic Services (as further defined below) to each home and multi-family dwelling unit in Tollgate Village ('Home') on an *exclusive basis* consistent with the terms of this Agreement and applicable law." (emphasis added)); R. 99-4 (Bridgemore CSA at 1) (Page ID #1527) ("Association has chosen Crystal Clear Technologies, LLC to operate and maintain the System, and to provide Basic Services (as further defined below) to each home and multi-family dwelling unit in Bridgemore Village ('Home') on an *exclusive basis* consistent with the terms of this Agreement and applicable law." (emphasis added)). The defendants argue that these exclusivity clauses are "one-off phrase[s]" and the remaining provisions "mandate a non-

exclusive arrangement and homeowner access to other providers."  Corrected Br. of Appellees Crystal Clear Techs., LLC and Carbine & Assocs., LLC, adopted by Appellees Tollgate Farms, LLC and Bridgemore Dev. Grp., LLC at 14 n.6.  The defendants are correct that the exclusivity clauses must be interpreted in light of the other contract provisions, *D&E Constr. Co.*, 38 S.W.3d at 519, and that some of these provisions do contemplate the theoretical provision of MVPD services by alternative providers, R. 99-3 (Tollgate CSA at 7) (Page ID #1498); R. 99-4 (Bridgemore CSA at 7) (Page ID #1533).  In the context of the entire contract, however, these exclusivity clauses are clearly designed to "prohibit any other MVPD from any access whatsoever to the premises of the MDU building or real estate development."[1]  Exclusivity Order at 20236 n.2.

First, the CSAs refer to easements that Crystal Clear Technologies obtained in each MDU.  R. 99-3 (Tollgate CSA at 1) (Page ID #1492); R. 99-4 (Bridgemore CSA at 7) (Page ID #1527).  The plaintiffs allege that these easements are exclusive and prevent any alternative provider from distributing services in the MDUs.  R. 99-1 (Proposed Second Amended Complaint at 27) (Page ID #1467).  To support this factual allegation, the plaintiffs have proffered a letter from the current owners of the Bridgemore development discussing the exclusive easements.  R. 99-7 (Gluck Letter at 3) (Page ID #1626).  Under Tennessee law, documents referred to in a written contract "may be properly considered in the construction of the contract." *Lasco Inc. v. Inman Constr. Corp.*, 467 S.W.3d 467, 473 (Tenn. Ct. App. 2015) (internal quotation marks omitted) (quoting *McCall v. Towne Square Inc.*, 503 S.W.2d 180, 183 (Tenn. 1973)).  Thus, the references to these exclusive easements support the plaintiffs' claim that the CSAs violate the Exclusivity Order.

---

[1]The majority relies on a footnote in the Exclusivity Order to construe narrowly the prohibition on exclusivity clauses.  It is true that the Exclusivity Order is limited to "building exclusivity clauses."  Exclusivity Order at 20236 n.2.  The FCC has defined building exclusivity clauses as clauses that "prohibit any other MVPD from any access whatsoever to the premises of the MDU building or real estate development."  *Id.*  Here, the provisions in the CSAs create this outcome de facto and therefore must fall within the parameters of the Exclusivity Order.  In other words, the FCC has defined building exclusivity clauses as clauses creating outcome *X.*  The clauses here also produce outcome *X.*  Therefore, these clauses must be subject to the Exclusivity Order because the underlying purpose of 47 U.S.C. § 548 and the Exclusivity Order would be eviscerated if parties could avoid the prohibition on exclusivity clauses by creating an exclusivity arrangement via the interaction of multiple contractual clauses as opposed to one clause standing on its own.

Second, other contractual provisions limit the ability of homeowners to communicate directly with alternate service providers, and vice-versa, and instead require communications to be funneled through Crystal Clear Technologies.**[2]** R. 99-3 (Tollgate CSA at 8) (Page ID #1499); R. 99-4 (Bridgemore CSA at 8) (Page ID #1534). Third, the CSAs allow Crystal Clear Technologies to charge alternative providers fees in order to offer services to homeowners. R. 99-3 (Tollgate CSA at 8) (Page ID #1499); R. 99-4 (Bridgemore CSA at 8) (Page ID #1534). Lastly, the CSAs bind the homeowners for twenty-five years and automatically renew for another twenty-five years; the homeowners cannot terminate the agreements until after the first twenty-five year period and must provide at least one year's notice to do so. R. 99-3 (Tollgate CSA at 16) (Page ID #1507); R. 99-4 (Bridgemore CSA at 17) (Page ID #1543). Collectively, these provisions, coupled with the explicit exclusivity clauses, demonstrate that the cumulative purpose and effect of the CSAs is to create a prohibited exclusivity arrangement.**[3]**

When viewing the CSAs as a whole, it is clear that "the purpose and effect of the agreement is to bar competing cable video providers from delivering service to the development by preventing them from ever building the infrastructure necessary to reach [the MDUs] in the first place." *Lansdowne on the Potomac Homeowners Ass'n v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 205–06 (4th Cir. 2013). The majority seeks to distinguish the facts alleged in this case from the Fourth Circuit's decision in *Lansdowne* in which our sister circuit concluded that a contract very similar to the one in this case violated the Exclusivity Order. 713 F.3d at 207. The majority points to differences that create no meaningful distinctions. Like the contested

---

**[2]**This is different from the exclusive marketing arrangements created by the CSAs, R. 99-3 (Tollgate CSA at 6) (Page ID #1497); R. 99-4 (Bridgemore CSA at 6) (Page ID #1532), which are permitted by the FCC. In the Matter of Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments: Second Report and Order, 25 FCC Rcd. 2460, 2471–73 (2010) (hereinafter "Bulk Billing and Exclusive Marketing Arrangements Order").

**[3]**The plaintiffs also point to the provision in each CSA that requires them to pay Crystal Clear Technologies regardless of whether they actually use the company's services. Appellants Br. at 8; R. 99-3 (Tollgate CSA at 10) (Page ID #1501); R. 99-4 (Bridgemore CSA at 10) (Page ID #1536). The FCC allows such mandatory fees as part of acceptable bulk billing arrangements. Bulk Billing and Exclusive Marketing Arrangements Order at 2465. Thus, this provision on its own does not support the plaintiffs' argument. The existence of a bulk billing arrangement, however, does not immunize the CSAs from the Exclusivity Order. Bulk billing arrangements must comply with the prohibitions articulated in the Exclusivity Order. *Id.* at 2465 & n.15. The FCC distinguished acceptable bulk billing arrangements from prohibited exclusivity clauses because acceptable bulk billing arrangements do not prevent alternative providers from providing services to homeowners nor do they stop homeowners from purchasing services from other providers. *Id.* at 2468.

agreements at issue in *Lansdowne*, the CSAs here have explicit exclusivity clauses. Furthermore, as in *Lansdowne*, when the CSAs are interpreted pursuant to applicable state law the clear conclusion is that they create a prohibited exclusivity arrangement notwithstanding some of the language in the CSAs to the contrary. When interpreted as a whole, the agreement produces "precisely the type of anti-competitive monopoly that the FCC sought to prohibit." *Lansdowne*, 713 F.3d at 205.

## III.

Defendants Tollgate Village Association Inc. and Bridgemore Village Owners' Association Inc.—the respective homeowners' associations of the MDUs—argue that the plaintiffs lack standing to assert a derivative claim against them. Br. of Tollgate Vill. Ass'n Inc. & Bridgemore Vill. Owners' Ass'n Inc. at 29. The majority did not need to reach this argument. I do, and conclude that the plaintiffs are bringing a direct claim—not a derivative claim—and therefore this argument is inapposite.

Under Tennessee law, the difference between a direct and a derivative claim is premised on "the nature of the wrong and to whom the relief should go." *Keller v. Estate of McRedmond*, 495 S.W.3d 852, 876 (Tenn. 2016) (quoting *Tooley v. Donaldson, Lufkin & Jenrett, Inc.*, 845 A.2d 1037, 1039 (Del. 2004)). In a derivative suit, the wrong is suffered by the corporation and the harm to the shareholder is "merely incidental to the wrong suffered by the corporation and affects all stockholders alike." *Id.* at 867 (internal quotation marks omitted). In contrast, in a direct action, the shareholder is the one who suffered the injury and any recovery would go to that injured shareholder. *Id.* at 868–69.

Here, the plaintiffs are asserting a direct action. They allege that they have directly suffered injuries, as opposed to the homeowners' associations. *See, e.g.,* R. 99-1 (Proposed Second Amended Complaint at 14) (Page ID #1454). Any recovery that the plaintiffs would win would inure to their benefit and not to the benefit of the homeowners' associations. Consequently, this is a direct claim under Tennessee law, and the argument of the homeowners' associations about the plaintiffs' lack of standing to assert a derivative claim is misplaced.

**IV.**

For the foregoing reasons, I respectfully dissent from Part II.C of the majority's opinion, and I would reverse the district court's denial of the plaintiffs' motion seeking leave to file the second amended complaint on the plaintiffs' exclusivity claim as well as on the plaintiffs' tying claim.